**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GERALDINE JOHNSON, | : | |
| As Administratrix of the Estate of | : | |
| Kenyado D. Newsuan, Deceased, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 14-2331 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and | : | |
| POLICE OFFICER THOMAS DEMPSEY, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

YOHN, J.                                                                April 30, 2015

In the early morning hours of April 22, 2012, Kenyado Newsuan was naked, high on PCP, and causing a commotion outside of his girlfriend's home in north Philadelphia. Police Officer Thomas Dempsey responded to the scene, where he and Newsuan thereafter engaged in a violent altercation that ended with Dempsey fatally shooting Newsuan. Geraldine Johnson, Newsuan's sister and the administratrix of his estate, subsequently filed this lawsuit against Dempsey and the City of Philadelphia under a variety of federal and state causes of action. Essentially, Johnson claims that Dempsey used excessive force against Newsuan and that the city failed to properly train and supervise its officers in handling such a situation. The defendants filed a motion for summary judgment, to which the plaintiff responded. Because the undisputed facts show that Dempsey did not act unreasonably in his use of lethal force, all of plaintiff's claims must fail. Accordingly, I will enter judgment in favor of defendants.

## I.        FACTUAL BACKGROUND

For summary judgment purposes, the court views the facts in the light most favorable to the nonmoving party, which means that in cases such as this one, the court "adopt[s] . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Here, that account can be found in plaintiff's reply to defendants' statement of undisputed facts, *see* Pl.'s Reply (Doc. No. 12) at 2-7, as well as in plaintiff's own statement of facts, *see id.* at 8-11.[1]  In both, plaintiff largely accepts defendants' account of the events in question.  Where those accounts differ, however, I have relied on plaintiff's version of the facts.

On the morning of Sunday, April 22, 2012, Officer Thomas Dempsey was on solo patrol in a radio car in the city's 35th police district, which generally covers the Olney neighborhood of north Philadelphia.  Dempsey Dep. 20:20-21:14, Oct. 28, 2014.  While on duty, Dempsey was armed with an ASP baton, a taser, and his service weapon, a nine-millimeter handgun.  *Id.* at 62:17-19; 63:1-3; 123:11-18.  The handgun was kept in a belt holster with a locking mechanism designed to impede its accidental or improper removal.  *Id.* at 123:19-124:7.  At approximately 2:00 AM, Dempsey received a radio call about a naked man in public on the 5800 block of North Mascher Street.  *Id.* at 85:17-23.  Dempsey responded to the call along with two other officers who were also on patrol in the district at that time.  *Id.* at 84:8-11.  The officers did not find anyone at the reported location, so they resumed their patrols.  *Id.* at 85:17-86:19.  At approximately 5:30 AM, Dempsey received another call about a naked man at the intersection of North Mascher Street and Nedro Avenue, or the 5800 block of North Mascher Street.  *Id.* at

---

[1] As part of the court's scheduling order of July 10, 2014 (Doc. No. 5), I directed any party filing a motion for summary judgment to also file a statement of undisputed facts—that is, "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the party contends there is no genuine issue to be tried."  *See* Order at 2 ¶ 7.  I further ordered any party opposing a motion to file a reply to this statement of undisputed facts, noting that "[a]ll factual assertions set forth in the statement required to be served by the moving party shall be deemed admitted unless controverted by the statement required to be served by the opposing party."  *Id.*  To the extent that plaintiff's reply to defendants' statement of undisputed facts may differ from plaintiff's own statement of facts, therefore, I will consider the reply to be controlling under the terms of the scheduling order.

87:12-23.  Dempsey responded and did not find anyone matching that description.  *Id.* at 91:10-92:13.  Again, Dempsey resumed his patrol of the district.  *Id.* at 92:17-21.

At approximately 6:00 AM, while he was writing a parking ticket on the 6000 block of North Mascher Street, Dempsey was flagged down by a passing motorist, who informed him that there was a naked man at North Mascher Street and Nedro Avenue.  *Id.* at 95:13-18.  Dempsey radioed in the information and drove to the 5800 block of North Mascher Street.  *Id.* at 97:9-100:15.  There, Dempsey saw a naked black man standing in the street.  *Id.* at 101:7-9.  The man, who would later be identified as Kenyado Newsuan, began walking toward the building in which his girlfriend lived.  *Id.* at 104:21-24.  Dempsey did not radio in to dispatch that he had arrived on the scene.  *Id.* at 106:3-8.

Dempsey exited his patrol car and ordered Newsuan to come toward him.  Defs.' Statement of Undisputed Facts (Doc. No. 10-1) at 3 ¶ 20; Pl.'s Reply at 4 ¶ 20.  Dempsey saw that Newsuan was completely naked and appeared to be holding nothing in his hands.  Pl.'s Reply at 4 ¶ 18.  Newsuan then briefly entered and exited the building at 5834 North Mascher Street.  *Id.* at 5 ¶ 21.  Newsuan then moved toward Dempsey, and as he approached, Dempsey fired his taser at Newsuan.  Defs.' Statement of Undisputed Facts at 3 ¶ 22; Pl.'s Reply at 4 ¶ 22.  Plaintiff admits that at this point, the eyewitness most sympathetic to plaintiff's account—Newsuan's girlfriend, Christina La Torre—went back into her house and "did not see any further struggle between Newsuan and Officer Dempsey."  Defs.' Statement of Undisputed Facts at 3 ¶ 25; Pl.'s Reply at 5 ¶ 25; La Torre Dep. 43:4-47:16, Nov. 10, 2014.

By plaintiff's own admission, being hit with a taser did not stop Newsuan from continuing to approach Dempsey, as Newsuan came up and grabbed Dempsey by the shirt.  Pl.'s Reply at 10.  Plaintiff admits that Newsuan then "began to struggle" with Dempsey.  *Id.* at 5

¶ 26.[2]  Plaintiff further admits that "[d]uring the struggle, Newsuan slammed Officer Dempsey against parked cars and attempted to strike him in the head." *Id.* at ¶ 27.  The force with which Newsuan threw Officer Dempsey against one car was such that it caused the side panel of the door to incur a 2-3 foot dent.[3]  Plaintiff's reply admits and eyewitness testimony confirms this account: Juan Cruz, a resident of the 5800 block of North Mascher Street who viewed the events that morning, testified that Newsuan began "actually beating the officer" and "slamming the officer, sort of like his head or something, against the windshield of the [police] car."  Cruz Dep. 11:19-12:9, Oct. 28, 2014.  Raimundo Rivera, another resident of the same block who also witnessed the altercation, testified that Newsuan "slam[med] the officer against his patrol car and grab[bed] him by the neck and start[ed] pummeling his head against the car."  Rivera Dep. 12:23-13:3, Oct. 28, 2014.

Newsuan next began pulling at the gun in Dempsey's belt holster.  Dempsey Dep. 131:16-18.  He attempted to take Officer Dempsey's gun.  Defs.' Statement of Undisputed Facts at 3-4 ¶¶ 27, 30; Pl.'s Reply at 6 ¶¶ 30-31.  Dempsey asserts that Newsuan "had a grip" and was "trying to pull on it" *Id.* at 132:3-4.[4]  Again, eyewitnesses corroborate this account.  Cruz testifies that "it seems like [Newsuan] was either going for the officer's gun or grabbing the officer's gun belt."  Cruz Dep. 12:21-23.  Rivera testifies that Newsuan "reach[ed] for his gun" and that as Newsuan "tr[ied] to reach for his gun, the officer [tried] to push him off with his

---

[2] I note that plaintiff's statement of facts does not mention any struggle between Newsuan and Dempsey—rather, that account jumps from Newsuan's grabbing Dempsey by the shirt to Dempsey's drawing his service weapon and firing it at Newsuan.  Pl.'s Reply at 10.  In plaintiff's reply to defendants' statement of undisputed facts, however, plaintiff admits to the key facts of defendants' account:  Newsuan slammed Dempsey into parked cars, tried to strike him in the head, and attempted to take his gun.  *Id.* at 5 ¶¶ 26-27, 6 ¶ 30.  Plaintiff denies only that Dempsey truly felt he was in danger and that Newsuan could have succeeded in removing the gun from Dempsey's holster.  *Id.*

[3] *See* Mot. Summ. J. Ex. H, at P08 (crime scene photograph showing damage to side of parked car).

[4] Plaintiff "admit[s] that this will be the testimony of [Dempsey, but] denie[s] that Mr. Newsuan ever had any remote chance to take Officer Dempsey's gun from his holster."  Pl.'s Reply at 6 ¶ 30.

hand, but at the same time he[] tr[ied] to reach for the gun so that [Newsuan] doesn't get it." Rivera Dep. 13:19-14:11.  These accounts are not disputed.

At this point, Dempsey removed the handgun from his holster and fired it at Newsuan, taking two shots, then, after the first volley did not appear to bring him down, taking two more. Pl.'s Reply at 6 ¶¶ 31-32.  According to an autopsy report from the medical examiner's office, Newsuan was struck twice in the chest and once in the abdomen, and he died as a result of these injuries.  *See* Office of the Medical Examiner's Autopsy Report (Doc. No. 10-6) at 1-3.  The medical examiner's office also produced a toxicology report, which found the drug phencyclidine (commonly known as PCP) present in Newsuan's blood.  *See* Office of the Medical Examiner's Toxicology Report (Doc. No. 10-7) at 1.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party."  *Roth v. Norfalco, LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (citations and internal quotation marks omitted).  To establish the existence or absence of a genuine dispute as to any material fact, a party must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).

"In evaluating the motion, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'"

*Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  More specifically, as the

Third Circuit has noted, "a court ruling on summary judgment in a deadly-force case should be

cautious . . . to ensure that the officer[ is] not taking advantage of the fact that the witness most

likely to contradict [his] story—the person shot dead—is unable to testify.  Thus, a court should

avoid simply accepting what may be a selfserving account by the officer[].  It must also look at

the circumstantial evidence that, if believed, would tend to discredit the police officer['s] story,

and consider whether this evidence could convince a rational fact finder that the officer[] acted

unreasonably." *Lamont v. New Jersey*, 637 F.3d 177, 181-82 (3d Cir. 2011) (internal quotation

marks and citations omitted).  But, the Third Circuit added, "Just as in a run-of-the-mill civil

action, the party opposing summary judgment in a deadly-force case must point to evidence—

whether direct or circumstantial—that creates a genuine issue of material fact, 'and may not rely

simply on the assertion that a reasonable jury could discredit the opponent[s'] account.'"  *Id.* at

182 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003)).  "Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (citation and internal quotation marks omitted).

## III.  DISCUSSION

Johnson, as administratrix of Newsuan's estate, brings five claims stemming from

Newsuan's death.  First is an action under 42 U.S.C. § 1983 against Dempsey, on the ground that

Dempsey violated Newsuan's Fourth Amendment rights.  Second is a *Monell* action against the

City of Philadelphia, under the theory that the city failed to train and/or supervise its police

officers.  Third is a common law assault and battery claim against Dempsey.  Fourth is an action

against both defendants under Pennsylvania's Wrongful Death Act.  Fifth is an action against
both defendants under Pennsylvania's Survival Act.

      A.      **Section 1983 Claim**

      Johnson's first claim is brought against Dempsey under § 1983, which provides for the
imposition of liability on any person who, acting under color of state law, deprives another of
rights, privileges, or immunities secured by the Constitution or laws of the United States.  The
statute is not itself a source of substantive rights, but instead provides "a method for vindicating
federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quotation
marks omitted).  At issue here is Newsuan's Fourth Amendment right to be free of unreasonable
seizure.  As the Third Circuit has explained:

> The Fourth Amendment safeguards "[t]he right of the people to be secure in their
> persons . . . against unreasonable . . . seizures."  To prevail on a Fourth
> Amendment excessive-force claim, a plaintiff must show that a seizure occurred
> and that it was unreasonable under the circumstances.  There is no dispute that
> [law enforcement officers] "seized" [decedent] when they shot and killed him.
> The question, instead, is whether the seizure was unreasonable.

*Lamont*, 637 F.3d at 182-83 (citations omitted).  In determining whether a seizure by use of
lethal force was reasonable, the Third Circuit has further advised that "[i]t is unreasonable for an
officer to use deadly force against a suspect unless the officer has good reason 'to believe that
the suspect poses a significant threat of death or serious physical injury to the officer or others.'"
*Id.* at 183 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  As the Supreme Court has
stated, "The 'reasonableness' of a particular use of force must be judged from the perspective of
a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490
U.S. at 396.  Indeed, "[t]he calculus of reasonableness must embody allowance for the fact that
police officers are often forced to make split-second judgments—in circumstances that are tense,
uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation." *Id.* at 396-97.  At the motion for summary judgment stage on this Fourth Amendment claim, therefore, the relevant question is whether plaintiff has adduced evidence of Dempsey's unreasonableness in his use of force "sufficient to permit a reasonable jury to return a verdict" for plaintiff.  *Roth*, 651 F.3d at 373.

The record here falls far short of that bar.  It is undisputed that, as Newsuan moved toward Dempsey on North Mascher Street, being hit with a taser did not stop his approach.  It is undisputed that Newsuan proceeded to grapple with Dempsey and attempted to strike him in the head—and eyewitness testimony confirms that Newsuan did succeed in slamming Dempsey's head into the windshield of the police car.  He also threw Officer Dempsey against the side of a car with such force that his body created a 2-3 foot dent in the side panel.  Most importantly, it is undisputed that, in the course of this struggle, Newsuan attempted to grab hold of Dempsey's gun.  Presented with this evidence, no reasonable jury could find that a reasonable officer in Dempsey's position lacked "good reason to believe that [Newsuan] pose[d] a significant threat of death or serious physical injury."  *Lamont*, 637 F.3d at 183.  Particularly in view of Newsuan's attempt to take Officer Dempsey's firearm, after an already significant physical struggle, any reasonable police officer would be in fear of death or serious bodily injury.  In other words, no reasonable jury could find that Dempsey's actions were unreasonable under the circumstances, and since the use of force was not unreasonable, it did not amount to a violation of the Fourth Amendment.  The § 1983 claim against Dempsey must fail at this stage, therefore, because "the evidence is [in]sufficient to permit a reasonable jury to return a verdict" for plaintiff.  *Roth*, 651 F.3d at 373.

Plaintiff raises two main counterarguments, but neither is availing.  First, plaintiff asserts that Dempsey "knew that it was virtually impossible for Newsuan" to gain control of his gun,

because "Dempsey was carrying a PPD issued police gun and holster which prevents a person from taking the gun out of the holster who is not trained in the special method of how to draw a gun from the holster," adding, "It is very difficult, if not impossible, for a person who is not the officer wearing the holster to remove the gun from the holster." Pl.'s Reply at 10. For one thing, Dempsey's subjective beliefs are irrelevant: as the Supreme Court has remarked, "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397. The relevant, objective criterion is what a reasonable officer in Dempsey's position would have believed. For another, the low odds of successfully removing a gun from a police officer's holster are not dispositive here. Even before Newsuan grabbed for Dempsey's gun, Newsuan repeatedly struck Dempsey in the head and slammed him into the windshield of his patrol car, all after having been unaffected by a taser. A reasonable officer in that position has good reason to believe that he faces a significant threat of death or serious bodily injury—regardless of how difficult (though not impossible, as plaintiff admits) it may be for the person that he is grappling with to remove the gun from the officer's holster.

Second, plaintiff argues that the court must look beyond "those few seconds when Officer Dempsey and Mr. Newsuan were struggling" and instead consider whether, "looking at the totality of the circumstances, Police Officer Dempsey's actions were reasonable." Pl.'s Reply at 24. To that end, plaintiff argues that Dempsey "should have retreated and awaited the arrival of other police officers whom he knew were on their way." *Id.* at 26. But the Third Circuit rejected this type of reasoning in *Lamont v. New Jersey*. There, law enforcement officers shot and killed a suspected car thief during a standoff when, after being ordered to show his hands and freeze, the suspect made a motion as if he were drawing a gun out of his waistband. *Lamont*, 637 F.3d

9

at 179.  The administrator of his estate filed suit under § 1983 and argued, *inter alia*, that "the

troopers should have set up a perimeter around the woods and used a K-9 to flush [the decedent]

out."  *Id.* at 185.  As the court put it, "If the decision to enter the woods was unreasonable, the

plaintiff reasons, then any force employed once in the woods was necessarily unreasonable, too,

because the force would not have been used had the troopers not gone into the woods."  *Id.*

Rather than adopt this logic, however, the court described it as "premised on a flawed

understanding of the doctrine of proximate causation."  *Id.*  As the court explained:

> [T]he troopers' decision to enter the woods did not proximately cause
> [decedent's] death.  Rather, [decedent's] noncompliant, threatening conduct in the
> woods was a superseding cause that served to break the chain of causation
> between the entry and the shooting.  Holding otherwise would . . . tend to deter
> police officers from approaching and detaining potentially violent suspects.

*Id.* at 186 (citation and internal quotation marks omitted).  The same must be said in this case.

Dempsey's decisions not to wait for fellow officers and not to retreat into his vehicle were not

the proximate cause of Newsuan's death.  Rather, Newsuan brought about his death through his

own violent conduct—in particular, his attempt to take Dempsey's gun.[5]  In sum, no reasonable

---

[5] Plaintiff's assertion that Dempsey acted unreasonably by violating Philadelphia Police Department Directive 136 (Doc. No. 12 at 38-46) is similarly unavailing.  Directive 136 sets out policy and procedures for handling a "severely mentally disabled person" ("SMDP"), which includes someone experiencing psychosis caused by drug use.  *Id.* at 39.  First, even though plaintiff avoids quoting any such language, Directive 136 expressly recognizes that officers may deviate from its protocols when their safety is threatened.  For instance, plaintiff asserts that under Directive 136, "the main objective of handling a mentally disabled person is to 'aid and protect the interest' of such a person." Pl.'s Reply at 22.  However, as the Directive provides in full:

> The main objective when handling a "Severely Mentally Disabled Person" (SMDP) is to aid and
> protect the interests of the SMDP, innocent bystanders, and family members in the immediate
> area, *without compromising the safety of all parties concerned, including the police officers.*

*Id.* at 38 (emphasis added).  Likewise, plaintiff quotes Directive 136 as stating that "'aggressive action will not be taken by police personnel.'"  *Id.* at 22.  In Directive 136, the sentence reads:  "Aggressive action will not be taken by police personnel, unless there is an *immediate threat* to life or physical danger to the SMDP, the police, or other civilians present."  *Id.* at 38.  Second, assuming *arguendo* that Dempsey violated Directive 136, in *Lamont* the Third Circuit affirmed the district court's granting of summary judgment to the officers on the basis that their initial use of deadly force was reasonable even where they allegedly "violated standard police procedures."  *Lamont*, 637 F.3d at 185; *see also Manigault v. King*, 339 F. App'x 229, 232 (3d Cir. 2009) (nonprecedential) ("Although the officers were trained to maintain a distance of at least 21 feet when facing a suspect carrying a knife, their abandonment of this protocol cannot form the basis for a remedy under § 1983 or deprive them of qualified immunity.").

jury could find on the evidence presented here that Newsuan's Fourth Amendment rights were

violated.[6]

### B.   *Monell* Claim

Plaintiff next brings a *Monell* claim against the City of Philadelphia for failing to

properly train and/or supervise its police officers in dealing with persons in Newsuan's situation.

Under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), a municipality

can be found liable when "execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

the injury that the government as an entity is responsible under § 1983." *Id.* at 694.  But as the

Supreme Court has held, a municipality cannot be found liable on a *Monell* claim where there

has been no underlying violation of rights under § 1983.  *City of Los Angeles v. Heller*, 475 U.S.

796, 799 (1986).  Here, the evidence shows that Dempsey did not violate Newsuan's Fourth

Amendment rights.  *See supra* Part III.A.  Without that underlying violation, plaintiff cannot

maintain a *Monell* claim against the city for its alleged failure to train and supervise its officers.

*See Kneipp v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996) ("[H]ad there not been an

underlying constitutional violation in the first instance, plaintiff's 'failure to train' claim against

the City would not stand.").  Defendants are therefore entitled to judgment on this claim as well.

### C.   Assault and Battery

The evidence likewise fails to support plaintiff's common law assault and battery claim

against Dempsey.  As defendants rightly argue, this claim is barred by Pennsylvania's Political

Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa. Cons. Stat. Ann. §§ 8541 *et seq*.  The

---

[6] Because I conclude that Dempsey did not violate Newsuan's Fourth Amendment rights in his use of deadly force, I
need not address defendants' claims of qualified immunity.  But I note in passing that where "plaintiff fails to make
out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity."
*Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002).

Tort Claims Act provides to municipal employees acting within the scope of their employment

immunity from suit "for any damages on account of any injury to a person or property caused by

any act of the local agency or an employee thereof or any other person." *Id.* The Tort Claims

Act does contain several exceptions, however, and plaintiff argues that one applies here: the

exception for "willful misconduct." *Id.* § 8550.

The Commonwealth Court of Pennsylvania directly addressed the applicability of the

"willful misconduct" exception to a claim of assault and battery against police officers in *Lucas*

*v. City of Philadelphia*, No. 1778 C.D. 2011, 2012 WL 8691954 (Pa. Commw. Ct. June 6, 2012).

As the court explained:

> Where a plaintiff alleges assault and battery against a police officer, he must
> establish the officer acted outside the scope of his job, *i.e.*, committed willful
> misconduct.  For police officers, such willful misconduct is established by
> showing the officer not only intentionally used force, but intentionally used
> *excessive* force.  This heightened standard, willful misconduct aforethought,
> shields police officers from liability for damages incidental to police operations,
> which may otherwise constitute an intentional tort if committed by a private
> citizen.
>
> The question of whether an officer used excessive force requires determining
> whether the force used was objectively reasonable in light of the surrounding facts
> and circumstances.  Relevant considerations include whether the suspect poses an
> immediate threat to the safety of the officers or others, and whether he is actively
> resisting or attempting to evade arrest by flight.  If a police officer uses reasonable
> force in making a lawful arrest, he cannot be liable for assault and battery.

*Id.* at *3 (citations and internal quotation marks omitted).  Applying that standard, the court

affirmed a grant of summary judgment for defendants where "the undisputed material facts

support the . . . determination that both officers used a reasonable amount of force . . . under the

circumstances."  *Id.* at *5 (citing *Renk v. City of Pittsburgh*, 641 A.2d 289 (Pa. 1994)).

Here, for all the reasons discussed in detail above, the undisputed facts—in particular,

plaintiff's admission that Newsuan attempted to strike Dempsey in the head and tried to take his

gun—likewise support the determination that Dempsey used a reasonable amount of force against Newsuan under the circumstances.  Thus, plaintiff has not shown a material issue of fact as to whether Dempsey's actions amounted to "willful misconduct," and as a result, I must conclude that Dempsey has immunity from plaintiff's assault and battery claim under state law.

### D.    Wrongful Death Act and Survival Act

Finally, plaintiff brings claims against both defendants under Pennsylvania's Wrongful Death Act, 42 Pa. Cons. Stat. Ann. § 8301, and the state's Survival Act, § 8302.  But "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death."  *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011); *see also Carroll v. Skloff*, 202 A.2d 9, 10-11 (Pa. 1964) ("The cause of action created by the survival statute is strictly derivative. . . . It is grounded upon an existing personal cause of action which the deceased could have but did not institute during his or her lifetime."), *overruled on other grounds by Amadio v. Levin*, 501 A.2d 1085 (Pa. 1985); *Sunderland v. R.A. Barlow Homebuilders*, 791 A.2d 384, 390-91 (2002) ("A wrongful death action is derivative of the injury which would have supported the decedent's own cause of action and is dependent upon the decedent's cause of action being viable at the time of death."), *aff'd,* 838 A.2d 662 (Pa. 2003).  In other words, just as plaintiff's *Monell* claim cannot survive without having shown an underlying violation of rights, plaintiff's Wrongful Death Act and Survival Act claims must fall without having adduced evidence of a viable claim on one or more of the underlying causes of action.

## IV.    CONCLUSION

For the reasons set forth above, I will enter judgment for defendants on all claims.  An appropriate order follows.